137 N.W.2d 218 (1965)
In the Matter of the GUARDIANSHIP OF the Property of Eleanor FRANK.
Bertha M. SCHMIDT, Odelia Tishmack, Angeline Mahrer, and Ralph J. Frank, Petitioners and Appellants,
v.
Leo R. FRANK, also known as L. Richard Frank, Ronald E. Frank, Eleanor Frank, Rose Mary Frank, and Reverend Hugo Backes, as special guardian of Eleanor Frank, Respondents.
No. 8147.
Supreme Court of North Dakota.
September 23, 1965.
*219 Vogel, Ulmer & Eair, Mandan, for petitioners and appellants.
Maurice G. LaGrave, Mandan, for respondents.
MORRIS, Commissioner.
On March 30, 1963, the County Court of Morton County, Honorable W. J. Austin acting by designation and request of Honorable Carl Borge, County Judge of Morton County, found the respondent in that Court, Eleanor Frank, to be incompetent and that it was necessary to appoint a general guardian of her property. An appeal was taken to the District Court of Morton County. Upon a trial before the Court without a jury the District Court found that Eleanor Frank was competent and capable of managing her own affairs, and reversed the decision of the County Court. The original petitioners in the County Court now appeal to the Supreme Court and demand a trial de novo.
Eleanor Frank, at the time of the trial in County Court, was sixty-seven years of age and was a widow whose husband had died intestate on May 20, 1962. She was the administratrix of that estate. She and her *220 deceased husband were the parents of seven adult children, Bertha M. Schmidt, Odelia Tishmack, Angeline Mahrer, and Ralph J. Frank, who are petitioners; and Leo R. Frank, Ronald E. Frank, and Rose Mary Frank, who, together with their mother and her special guardian, are respondents.
John Frank, the husband and father, died seized of about seventeen quarter-sections of land, of which the widow inherited one-third and the children two-twenty-firsts each. This land was divided into three farms, one of which was farmed by each of the three sons under an agreement with the father. After his death, and during the summer of 1962, there were a number of family meetings at the home of the widow in Flasher, North Dakota, at which there was considerable discussion concerning the acquisition by the sons of the land they had been farming by purchase from the other heirs. No agreement was reached and some ill will developed between the participants, particularly the children. On December 8, 1962, Eleanor Frank was taken to a hospital suffering from what was termed a "slight stroke." She was released about nine days later and went to the home of her daughter, Rose Frank, in Bismarck. On December 19 some discussion was had between Eleanor Frank, her daughter, Rose Mary, and her sons Leo and Ronald, regarding her sale to the two sons of her one-third interest in the estate land. On December 21 she executed deeds to these two sons for her one-third interest in all of the land, based on a value of $20.00 per acre, which was the value fixed by the appraisers of the estate. The purchase price of that portion of the land sold to Leo was evidenced by a note signed by him and his wife for $12,090.60, payable ten years after date, with interest at the rate of four percent per annum, payable annually. Ronald and his wife gave a similar note for the purchase price of the land sold to them in the sum of $7,607.40, due twelve years after date. At the same time Rose Mary Frank sold her interest in the estate to her brothers Leo and Ronald on the basis of a value of $30.00 per acre, payable on the same terms as the land sold by her mother.
Much of the argument made to support the charge of incompetency is based on the fact that Eleanor Frank sold her interest in the land on the basis of a $20.00 per acre valuation, while Rose Mary sold her interest to the same purchasers on the basis of a valuation of $30.00 per acre. It is also argued that Mrs. Frank had very little business experience, that she had but a meager knowledge of the English language and preferred to speak German, and that she could read very little English and wrote very little. It is obvious from reading the transcript that this facet of the case interested the trial court, who asked a number of pertinent questions, particularly of Eleanor Frank, who had not testified at the hearing in County Court.
In reply to questions by the trial court she testified that if her husband was going to buy a piece of land he would talk it over with her and she would look at the property, and he told her how much an acre and everything. He would also talk to her about renting out land. He would talk to her about buying farm machinery, and she would tell him that if he needed it, buy it. He also told her everything about the property he owned and monies they had in banks. The court pointed out to her that they had some joint tenancy bank deposits and asked her what, in her opinion, joint tenancy meant.
"A. That means you get it.
"Q. Have it together?
"A. Yah.
"Q. What happens to it then when one person dies?
"A. Then the next one gets all."
While her answers to these and other questions may not have been in perfect English they clearly indicate that she understood the meaning of joint tenancy, and that she knew and understood the nature and extent of the property and business affairs *221 of her husband and herself. She also appears to have known the extent to which her husband helped finance the boys in their farming operations. When asked if she fixed the price of $20.00 an acre, she replied:
"Yes, I fixed the price, I said it's my own price, I don't take more from them, not $40 or $50 an acre."
Doctor Thakor, a practicing physician specializing in psychiatry, testified regarding the results of an examination that he gave Eleanor Frank in March, 1963. In the course of his testimony he said:
"Whenafter all these examinations were done, I felt that at the time we found Mrs. Frank to be quite alert, friendly person, she answered my questions fairly well, she did show some signs of advancing age but her judgment in practical affairs was average. I did not find any signs of any psychoses, I did not find any delusions or hallucinations.
* * * * * *
"She told me that she had sold some land to two of her sons, that she knew the reason why she wanted to sell them, she felt that it was her husband's wish that her daughters should get money and she should give the land to her sons and she knew what she was doing when she sold the land to the two sons."
The examination was made in English. As a result of his examination the doctor stated this conclusion:
"I would say as far as that dealing question is concerned, I would say she is competent."
On cross-examination the doctor testified that her I.Q. was 67. He also stated:
"I would like to qualify Mrs. Frank's I.Q.; at one time it was average, but due to advancing age and all, her current functioning is at 67."
The trial court in its memorandum opinion, after commenting on the testimony of Dr. Thakor, stated:
"Mrs. Frank also took the witness stand and on examination appeared to the Court to have a complete knowledge of her affairs and that her action in selling the land to the two sons was entirely of her own accord and was not brought about by undue influence. She stated that she felt she had a right to sell to her boys at less money than she would ask of other persons."
The appeal from the county court brought the case to the district court for a trial of the issues of fact upon evidence offered anew and not upon the record or transcript certified from the county court. Schwarz v. Thoreson, 70 N.D. 552, 296 N.W. 420. The case having been tried to the district court without a jury the appeal to the supreme court imposed upon this court the duty to review the entire district court record and exercise its independent judgment thereon. Nevertheless, the determination of the trial court upon the facts must be given appreciable weight, especially since it is based upon the testimony of witnesses who appeared in person before that court. In re Thoreson's Guardianship, 72 N.D. 101, 4 N.W.2d 822; Section 28-27-32, N.D.C.C. The unique duty imposed upon the supreme court by this statute to try all the facts anew upon the record made in the district court detracts from the precedential value of decisions of other appellate courts affirming lower courts where the scope of review is more restricted and less burdensome. Where such decisions resulted in affirmance their value lies largely in statements of legal principles.
Section 30-10-02, N.D.C.C., vests in the county court power to appoint a guardian of the person or estate, or both, where the jurisdictional facts exist and the person "is of unsound mind, or from any cause mentally or otherwise incompetent to manage his own property." Goetz v. Gunsch, N.D., 80 N.W.2d 548.
*222 In Watson v. Watson, 176 Cal. 342, 168 P. 341, the supreme court of California reversed a finding of incompetency made by the trial court which involved facts and statutory grounds for determining incompetency similar to those now before us. Mrs. Watson was a widow, seventy-eight years of age, the mother of six sons and three daughters. She was the owner of land of the value of fifty or sixty thousand dollars. It was claimed that she had conveyed land to one of her sons for an insignificant consideration. This transfer was urged as evidence of incompetency. So far as the evidence showed, the conveyance was the product of her own free volition without persuasion or pressure on the part of the son. She testified as a witness at considerable length. In commenting on this testimony, the court said:
"Her testimony, read as a whole, shows that she had a clear and distinct knowledge of her property interests, and a very definite understanding of her relations to her children, and of their claims upon her. She was able to enumerate and describe her various property holdings and the income derived from each. Her total gross annual income was about $1,700. She was not, it is true, able to state just what the net income was, or to give in detail the expenditures required for taxes and other charges against the property. But, in view of fact that these matters were, to a large extent, being attended to by her son Walter, no inference unfavorable to her mental capacity could fairly be drawn from this circumstance. Indeed, on the whole, it appears to us that her knowledge of her affairs was at least as extensive and accurate as that of the average person who has confided the management of his business interests to a trusted agent. She was suffering from some physical infirmities incident to her advanced years, such as deafness, rheumatism and bronchitis. But there is nothing to show that the clearness of her mind had been impaired in any substantial degree. Much is made of the circumstance that she was unable to recall the provisions of a will which she had made at some time not disclosed by the evidence. But this is of trivial consequence when it is considered that at the time of the hearing her own testimony showed, as above stated, a very complete knowledge of what her property was, and what she was doing and desired to do with it.
"One or two of her children testified that they thought she was not competent to look after her affairs. But this testimony was not supported by any good reason. It was founded principally upon the circumstance that she had made the conveyance to her son Walter.
"* * * Mrs. Watson's children had no vested right to an equal division of her estate. She was the owner of the property. It was her right to manage it as she pleased, either personally or through agents of her choice, and to dispose of it as she saw fit, unless her mental faculties were impaired to such an extent as to make her unable to properly manage and take care of it or to render her liable to imposition by `artful or designing persons.'"
That case was not reviewed in the supreme court on trial de novo but under the California rule that the finding below is to be sustained on appeal whenever there is any evidence which, with the aid of legitimate inferences, may fairly be thought to support it. The supreme court, nevertheless, reversed the lower court's finding and order.
In Briggs v. Baldridge, 122 Cal.App.2d 752, 266 P.2d 103, the district court of appeal of California reversed a finding of incompetency of an eighty year old widow, and in the course of its opinion quoted a part of the passage that we have quoted above from Watson v. Watson, supra.
*223 In Westerberg v. Olson, 236 Wis. 301, 295 N.W. 24, the supreme court of Wisconsin reversed a finding of incompetency of a seventy-five year old man. The court said:
"The proof must show that the alleged incompetent is incapable of taking care of himself and managing his property. The mental incompetency must exist at the time of the hearing or else the petition should be denied. To establish mental incompetency in will cases, the proof must be clear, convincing, and satisfactory. Will of Grosse, 208 Wis. 473, 476, 243 N.W. 465. The degree of proof should be no less, to warrant the appointment of a guardian of the person and estate of an alleged incompetent."
In Leatherman v. Leatherman, 82 W.Va. 748, 97 S.E. 294, in reversing a determination of incompetency of a sixty-four year old man, the court said:
"In determining whether or not a person is of such unsound mind as would entitle a court to take from him the right of personal freedom and the right to manage and dispose of his own property, we know of no other test than the one which has often been applied by this court and courts of other jurisdictions in suits to avoid wills and deeds on the ground of the alleged incompetency of the testator or grantor. The authorities do not undertake to prescribe the degree of mental acumen necessary to enable a person to make a deed or will. But they all seem to agree that, if grantor or testator knows and understands the nature and effect of his act, he has sufficient capacity to enable him to dispose of his property."
The foregoing quotation has been referred to or quoted in a number of decisions, including Parrish v. Peoples, 214 Minn. 589, 9 N.W.2d 225.
In Johnson v. Johnson, N.D., 85 N.W.2d 211, paragraph 3 Syllabus by the Court, we said:
"Before a conveyance will be set aside because of the grantor's mental incompetency it must appear that the grantor at the time of the execution was so weak mentally as not to be able to comprehend the nature and effect of the transaction involved. Where the grantor, although of advanced age and somewhat impaired in health, comprehended the nature and effect of the transaction, the deed will not be set aside."
In Stormon v. Weiss, N.D., 65 N.W.2d 475, we quoted two passages from 1 Page on Wills, Lifetime Edition, Section 132:
"The standard of testamentary capacity which has finally been agreed upon, in substance, by the great weight of authority is as follows: Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them."
Section 133:
"If testator actually remembers and knows what his property is, who are the natural objects of his bounty, and who are the proposed beneficiaries, and his duties towards them, and if he actually understands the nature of the act which he is performing, capacity to make a will is established, at least in the absence of an insane delusion."
The appellants in this court emphatically cite as precedent In re Thoreson's Guardianship, 72 N.D. 101, 4 N.W.2d 822, where we affirmed the determination of the district court which had affirmed a *224 finding of the county court that the subject of the proceeding, an eighty-one year old woman, was mentally incompetent. This court quoted and agreed with the statement of facts in the memorandum opinion of the trial court as being in accord with the weight of the evidence. That evidence disclosed that the respondent, Anna Thoreson, was much more enfeebled, both physically and mentally, than appears to be the fact in the case before us. In this case the weight of the evidence is also in accord with the determination of the district court, but that determination is that Eleanor Frank is mentally competent. That is also our determination.
In connection with, and as a part of, the appeal from the judgment of the district court the appellants state in their notice of appeal that they "further demand review of that certain order denying motion for production, dated August 27, 1963, herein." This would indicate that the review thus sought is that of an intermediate order. The order referred to includes findings of fact of the trial court upon which the order was based. It states that at the hearing held in the county court upon the appointment of a guardian of the property of Eleanor Frank the respondents employed Joe Smith, official court reporter of the district court of Burleigh County, to take testimony and prepare a transcript. The transcript of the hearing is in the possession of counsel for the respondents and the motion for the production of the same is made under Rule 34, N.D.R.Civ.P. The order of the district court then recites:
"And it appearing from sworn return to the motion as follows:
"`That prior to the commencement of said hearing above referred to that counsel for the petitioners did state at least twice that he had no objection to the respondents employing said court reporter but that it must be understood that said court reporter was employed by the respondents and that petitioners would not be obligated therefor.
"`That the petitioners had an opportunity to agree to share the cost of said court reporter and transcript at said time and place but chose instead not to take said opportunity but to negative any obligation for said services and any right to the work product thereby created.'
"That Affidavit in support of petitioners' Motion states in effect that a copy of said transcript would give the respondents herein an advantage over the petitioners in the trial de novo in said matter in District Court so far as impeachment of witnesses and in so far as verification of impeachment of witnesses."
The trial court then concluded from its findings that the transcript was obtained by the attorney for the respondents and by his employee in preparation for trial in the district court in case of an appeal, and that the petitioners had not shown necessity, industry or diligence such as to entitle them to the production of the transcript, and that it constituted a work product in preparation for trial. Whereupon the court denied the motion for production.
In Federal Practice and Procedure, Rules Edition, Barron and Holtzoff, Vol. 2A, page 176, it is said:
"Discovery orders can be reviewed also on appeal from a final judgment, but it will be difficult at that stage to show that the party has been prejudiced by the order, or that the question is not moot, and the harmless error doctrine, together with the broad discretion that discovery rules vest in the trial court, will bar reversal save under very unusual circumstances. This is especially true where the order has granted discovery, since there is no effective means of correcting such an order once the discovery has been had. Reversal is more likely, though still *225 unusual, where the trial court has erroneously denied or limited discovery."
See also Barron and Holtzoff, supra, page 473.
In Tiedman v. American Pigment Corporation, 4 Cir., 253 F.2d 803, it is stated that:
"Granting or denying a request under rule 34 is a matter within the trial court's discretion, and it will be reversed only if the action taken was improvident and affected substantial rights."
It is also therein stated that an appellate court will not decide whether it would in the first instance have permitted discovery prayed for.
It appears to us that under the circumstances here presented there was no abuse of discretion on the part of the trial court in denying the motion.
We would further point out that in the case before us no prejudice whatever to the rights of the appellants is shown by the record. The most important testimony was given by witnesses who appeared in the district court for the first time, and there is nothing in connection with the examination of the witnesses who had testified in the county court, and whose testimony had been heard by the appellants and their counsel, that any witness had changed his testimony. A party who seeks the reversal of a judgment because of a ruling of the court has the burden of showing that his substantial rights have been prejudiced by the ruling of which he complains. Killmer v. Duchscherer, N.D., 72 N.W.2d 650, and cases therein cited.
We agree fully with the determination of the trial court with respect to the competency of Eleanor Frank and have decided that the trial court did not abuse its discretion in denying the appellants' motion for production of the respondents' transcript of the hearing in the county court. The judgment and the order herein reviewed are affirmed.
PER CURIAM.
The foregoing opinion by the Honorable JAMES MORRIS, a retired judge and duly appointed and qualified Commissioner of the Supreme Court, is adopted and made the opinion and decision of the Court.
BURKE, C. J., and TEIGEN, STRUTZ and ERICKSTAD, JJ., concur.
KNUDSON, J., not being a member of the Court at the time of submission of this case, did not participate.